IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEANNA H. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY | : | No. 23-cv-1072 |
| | : | |

**MEMORANDUM OPINION**

**CRAIG M. STRAW**                                             **October 18, 2024**
**United States Magistrate Judge**

Deanna H. seeks review of the Commissioner's decision denying her application for

Disability Insurance Benefits (DIB).  The parties consented to proceed before a Magistrate

Judge.[1]  Doc. 4.[2]  For the following reasons, I deny Plaintiff's request for review and affirm the

Commissioner's decision.

## I.       PROCEDURAL HISTORY

Plaintiff filed an application for DIB under the Social Security Act on March 25, 2021,

alleging a disability beginning on January 14, 2020.  R. 12, 180-84.  The Social Security

Administration (SSA) initially denied the claim on May 26, 2021, and then denied it again on

reconsideration.  R. 87, 102-03.  Plaintiff requested a hearing before an administrative law judge

(ALJ).  R. 113, 132.

On January 12, 2022, a telephonic hearing took place before ALJ Margaret Gabell due to

Covid-19 Pandemic restrictions.  R. 12, 29, 31.  Plaintiff appeared with her counsel Lori

---

[1] See Doc. 4; 28 U.S.C. § 636(c) & Fed. R. Civ. P. 73.
[2] Citations to documents on the docket are to the CM/ECF pagination of the documents.

Mannicci.  R. 31-32.  Vocational Expert (VE) Asheley Wells also testified at the hearing.  R. 12, 47-50.

The ALJ issued a decision denying benefits.  R. 12-24.  Plaintiff filed a request for review of the ALJ's decision, which was denied.  R. 1, 177-78.  Therefore, the ALJ's decision became the final decision of the Commissioner of Social Security.  R. 2; 20 C.F.R. § 404.981.

Plaintiff's counsel initiated this action in federal court.  Doc. 1.  Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  Doc. 8.  Defendant filed a Response to Plaintiff's Request for Review.  Doc. 11.  Plaintiff filed a Reply Brief.  Doc. 12.

## II.   **LEGAL STANDARDS**

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Commissioner employs a five-step sequential process to determine if a claimant is disabled, evaluating:

1.   Whether the claimant is currently engaged in substantial gainful activity;

2.   If not, whether the claimant has a "severe impairment" that significantly limits their physical or mental ability to perform basic work activities;

3.   If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings," see 20 C.F.R. pt. 404, subpt. P, app. 1), which results in a presumption of disability;

4.   If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity (RFC) to perform their past work; and

2

5.      If the claimant cannot perform their past work, whether there is other work in the national economy that the claimant can perform based on the claimant's age, education, and work experience.

See Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014); 20 C.F.R. § 404.1520(a)(4).  Plaintiff

bears the burden of proof at steps one through four, while the burden shifts to the Commissioner

at step five to establish that the claimant can perform other jobs in the local and national

economies based on their age, education, work experience, and RFC.  See Poulos v. Comm'r of

Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision

is supported by substantial evidence.  See 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc.

Sec., 181 F.3d 429, 431 (3d Cir. 1999).  "Substantial evidence is 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion,'" and must be "'more than a

mere scintilla but may be somewhat less than a preponderance of the evidence."  Zirnsak, 777

F.3d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek

v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (explaining substantial evidence "means only—'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion'")

(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (additional citations omitted)).

It is a deferential standard of review.  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (citing

Schaudeck, 181 F.3d at 431).

## III.    ALJ'S DECISION AND PLAINTIFF'S REQUEST FOR REVIEW

The ALJ determined that claimant met the insured status requirements of the SSA

through March 31, 2024 and had not engaged in substantial gainful employment since January

14, 2020—the alleged onset date (AOD).  R. 14.  The ALJ noted claimant had several severe

impairments including bipolar disorder, anxiety disorder, and attention deficit hyperactivity disorder (ADHD).  R. 14; 208; 20 C.F.R. § 404.1520(c).[3]  The ALJ decided that claimant's impairments, either singly or in combination, did not meet or medically equal any of the Listings set forth in 12.04, 12.06, and 12.11.[4]  R. 15; 20 C.F.R. pt. 404, subpt. P, app. 1; see also 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

The ALJ decided claimant's mental impairments did not satisfy the paragraph B criteria[5] because she did not have at least two "marked" limitations or one "extreme" limitation.  R. 15-16.  Specifically, the ALJ found a mild limitation in understanding, remembering, or applying information and no limitation adapting or managing oneself.  R. 16.  The ALJ determined that claimant had moderate limitations interacting with others and concentrating, persisting, or maintaining pace.  Id.  The ALJ also stated that although claimant had required psychiatric hospitalization in January 2020 with an additional partial hospitalization afterwards, her care since that time was routine and conservative without any emergency room visits for mental

---

[3] Additionally, the ALJ determined the claimant's physical impairments including asthma, plantar fasciitis, PCOS, GERD/dysphagia, tendinopathy (left elbow), and obesity, were not severe because they were treated and controlled by medication and/or other modalities.  R. 15.
[4] Listing 12.04 is for depressive disorder, bipolar and related disorders.  Listing 12.06 is for anxiety and obsessive-compulsive disorders.  Listing 12.11 is for neurodevelopmental disorders.  See 20 C.F.R. § pt. 404, subpt. P, app. 1.
[5] The four "paragraph B" criteria rate a claimant's functional limitations.  See 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04(A)(2)(B).  To satisfy the "paragraph B" criteria, the mental impairment must result in one extreme limitation or two marked limitations in the four areas of mental functioning.  Id. § 12.00(F)(2).  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  Id. § 12.00(F)(2)(e).  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.  Id. § 12.00(F)(2)(d).

health conditions, crisis interventions, or additional psychiatric hospitalizations, and therefore the paragraph C criteria had not been met.[6]  R. 16-17.

The ALJ outlined, in detail, claimant's symptoms, medical history, and the opinions of the medical providers assessing her mental impairments.  R. 17-22.  Considering the entire record, the ALJ opined that claimant has the RFC to perform a full range of work at all exertional levels, but the non-exertional limitations included unskilled work consisting of simple, routine tasks, with only simple decision-making, and only occasional changes in workplace.  R. 17.  The RFC also provided claimant can tolerate only occasional interaction with co-workers and/or supervisors, however, no direct public interaction.  Id.

The ALJ decided claimant could not perform any past relevant work as a registered nurse.  R. 22.  Relying on the VE's testimony, the ALJ determined that based on claimant's age, education, work experience, and RFC, a significant number of jobs existed in the national economy she could perform including laundry worker, domestic (laundry sorter), housekeeper (cleaner, housekeeping), and marker (price marker).  R. 23; 20 C.F.R. § 404.1569, 404.1569a.  Accordingly, the ALJ found that Plaintiff was not disabled.  R. 24; 20 C.F.R. § 404.1520(g).

In her request for review, Plaintiff argues that the ALJ erred when it found her statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent with and unsupported by the record.  Doc. 8, at 16-24.  Plaintiff also asserts the ALJ erred when it found psychiatrist Tania C. Martinez-Jiminez M.D.'s opinion unpersuasive.  Doc. 8, at 24-30.  Conversely, the Commissioner counters that the ALJ properly considered Plaintiff's subjective complaints and Dr. Martinez-Jiminez's opinion in her decision.  Doc. 11, at 14-22.

---

[6] See 20 C.F.R. pt. 404 subpt. P, app. 1 § 12.00(G)(2)(b)-(c).

## IV.     FACTUAL BACKGROUND

Plaintiff was 48-years old on the AOD, but later became an individual "closely approaching advanced age."  R. 23, 31, 205, 224; 20 C.F.R. § 404.1563(c), (d).  Plaintiff has a high school education with some years at a community college, and an associate degree in nursing.  R. 23, 42, 209.  She attended a four-year college but was asked to leave one year before she graduated because of "behavioral issues."  R. 42.  Plaintiff had already been diagnosed with anxiety and depression before college.  Id.  In June 2021, she was also diagnosed with ADHD. Id.

Plaintiff worked from 2005 to 2019 as a registered nurse caring for infants.  R. 209-10. In 2016, she chose to reduce her full-time hours and become a per-diem employee.  R. 36.  She stopped working all together in 2019 after she was assigned ICU babies instead of stepdown babies despite being a per-diem employee.  R. 42.  She claimed she was "picked on at work," and was "stressed" and "overwhelmed" because of her co-workers.  Id.  Plaintiff reported having a "minor mental breakdown" in September 2019 and was placed on a level three corrective action plan (one step before termination) for an incident at work.  R. 34-35.  She had been assigned a very sick baby and "had words with co-workers in front of [the] parents and basically lost [her] temper in front of everybody."  R. 34-35, 385.  Her manager called Plaintiff into her office, and she was asked to leave early that day.  R. 34.  Plaintiff did not feel comfortable going back to work on that particular floor, so Plaintiff remained home for three months and did not work.  R. 35.  Plaintiff never went back to her job as a nurse because, according to her, she "could not perform the duties that [were] required."  R. 36.

6

## A. Medical evidence[7]

Plaintiff's treating psychiatrist is Dr. Martinez-Jiminez.  R. 21, 740.  She saw Dr. Martinez-Jiminez in June 2018[8] at an office visit to address her anxiety, depression, ADHD, and stressors related to her work and her eight-year-old son who has autism.  R. 740-41.  At the time, she was taking Wellbutrin, Topamax, Venlafaxine, and Klonopin.  Id. at 740.  In July 2018, Plaintiff presented to St. Luke's Care Now because she was having feelings of severe depression and right upper quadrant pain for about a week and a half.  R. 804.  At the appointment, she realized she had accidentally taken 600 mg of Wellbutrin instead of her prescribed 300 mg dose.  Id.  Her depressive mood was much better at the time she presented because she knew why she was feeling that way.  Id.  Plaintiff was referred to St. Luke's emergency room department (ED) to have labs and imaging done.  Id.  It was later discovered that the pharmacy had mixed up her prescriptions and Plaintiff had been taking a double dose of Wellbutrin and no Effexor for the three weeks prior.  Id. at 809.  Plaintiff was concerned about the damage to her liver.  Id.  She was anxious and tearful, but had normal mood and affect, normal judgment, and no homicidal or suicidal ideations.  Id. at 811.

At her next appointment with Dr. Martinez-Jiminez on January 7, 2019, Plaintiff reported she was irritable, anxious, tense and could not focus at work or at home.  R. 745.  She also continued struggling to manage her nine-year-old's oppositional behavior.  Id.  Plaintiff did not feel Strattera was helping her ADHD symptoms and wanted to resume Vyvanse.  R. 745.

---

[7] I outline only the pertinent medical evidence regarding the issues raised on appeal and some additional information as background.

[8] Plaintiff submitted a document with her brief indicating she started treating with Dr. Martinez-Jiminez in 2016, however, the earliest treatment notes in the administrative record from him are from 2018.  R. 740; Doc. 8-2, at 2.

Strattera was switched to Cymbalta and her Topamax dosage was increased to 100 mg.  Id. at

748.

Plaintiff saw Dr. Martinez-Jiminez again in April 2019.  R. 750.  She was frustrated

because she lost her support person at home to medical leave and was having a difficult time

getting a team to work with her son.  Id.  She was mentally tired and depressed.  Id.  Plaintiff

said she had not been called in for work and contemplated quitting nursing.  Id.  She continued

her treatment of Topamax and Vyvanse.  R. 749.  At her July 3, 2019 visit, she stated she was

under a lot of stress with financial, marital, and health problems, along with problems involving

her son, especially since she was home with him alone during the summer.  R. 754.  She

continued feeling depressed and reported the antidepressant was not working and caused sexual

side effects.  Id.  She planned to taper off Venlafaxine and start Trintellix.  R. 754-55.

On January 6, 2020, Plaintiff went to the Lehigh Valley Health Network ED after

worsening depression, anxiety, and suicidal ideations.  R. 45, 380, 387.  She admitted to suicidal

ideations with passive plans to overdose on medications but did not act on those plans.  Id.  She

also admitted to homicidal ideations towards her son without any plans.  R. 380, 387, 395.

Plaintiff said she was compliant with her psychiatric medications; however, they were not

helping.  R. 380.  She was admitted to the hospital where she stayed for four days.  R. 39, 380.

Plaintiff improved and felt better over the course of her stay.  R. 396, 404, 406, 411, 415-16,

419-20, 423.  Plaintiff was discharged on January 10, 2020 with a diagnosis of bipolar disorder

with a recent hypomanic episode, ADHD, and generalized anxiety disorder (GAD).  R. 419.

After her hospital stay, Plaintiff did a partial hospitalization program (PHP) every day

from January 13-23, 2020.  R. 18, 39, 371-79.  At the intake for the PHP program, she was fully

8

oriented and cooperative, with sufficient concentration and attention.  R. 371, 375.  Her mood

was expansive, anxious, and hypomanic.  R. 375.  Her affect was labile and intense, speech was

verbose and pressurized, and while her thought process was tangential, her thought content was

relevant, goal-orientated, and non-bizarre.  R. 375, 379.  Plaintiff had no suicidal or homicidal

ideations.  R. 375.  Treatment notes from PHP mentioned Plaintiff's tendency to blame others.

R. 364, 367-69.  At the time of discharge on January 23, 2020, Plaintiff reported that she

benefitted from the PHP program and was ready to return home.  R. 362.

Treatment notes from a February 6, 2020 appointment with Dr. Martinez-Jiminez

indicate that Plaintiff reported her medications were discontinued during her hospitalization, and

she started on Abilify 15 mg.  R. 348.  At PHP, she transitioned to Seroquel 200 mg because of

severe insomnia and anxiety with Hydroxyzine 50 mg qhs.  Id.  The medication changes helped

but Plaintiff still felt irritable and anxious at times, so she wanted to start Lithium for mood

stabilization as she discussed with her doctors during her hospitalization.  Id.  Plaintiff reported

high anxiety and stress at a March 25, 2020 appointment since her son was home from school

because of the COVID-19 pandemic and agreed to increase one of her medications to help

stabilize her mood and decrease irritability.  R. 343.  At one point in September 2020, Plaintiff

was tired of trying and taking medications, and she asked Dr. Martinez-Jiminez about

electroconvulsive therapy (ECT).  R. 45.  Dr. Martinez-Jiminez responded that ECT therapy was

for depression, not bipolar disorder, and was not an option for Plaintiff.  R. 46.

She continued participating in outpatient therapy, regularly checking the levels of her

medications, and adjusting them when necessary.  R. 279, 286, 292, 308, 313, 319, 327, 336,

343, 348.  Plaintiff often reported feeling anxious, irritable, and stressed.  R. 279, 286, 288, 292,

294, 313, 316, 320, 323, 332, 336, 343.  Plaintiff visited St. Luke's Family medicine on February 9, 2021, complaining of symptoms of psychomotor retardation, constipation, shuffling gait, and slowed speech which had progressively worsened over the past three to four weeks after she increased her Vraylar from 3 mg to 4.5 mg.  R. 461.  The symptoms had improved since she stopped the prescription increase, and she was able to walk with assistance, but still had a mild tremor.  Id.  The records indicate Plaintiff was likely experiencing extrapyramidal effects from her mediation increase.  R. 460-61.  She was instructed to hold off on Vraylar, taper Benztropine 1 mg two times a day for two weeks and was referred to neurology.  R. 461.  Thereafter, she was admitted to St. Luke's hospital from February 10, 2021 to February 14, 2021 and was diagnosed with extrapyramidal syndrome.  R. 478, 541, 543.  Vraylar was discontinued under medical supervision.  R. 495-96, 505-06.  Tests indicated there was no acute intracranial abnormality.  R. 501.  After her medication was adjusted, her symptoms improved.  R. 478-79, 550, 552.

At a March 11, 2021 telemedicine appointment with Dr. Martinez-Jiminez, Plaintiff reported that her "anxiety was better controlled" and "she [wa]s gradually feeling back to her normal self" after being off Vraylar for a month.  R. 319.  She planned to start tapering off Cogentin and planned to take Propranolol 20 mg two times a day for the time being.  Id.  Plaintiff stated at her April 8, 2021 appointment that she was continuing to feel better since she stopped taking the Vraylar.  R. 313.  She saw Dr. Martinez-Jiminez about once a month for appointments.  R. 767, 773-74, 779, 792-93, 832, 928-29, 938.  She also began individual therapy appointments about every two weeks with Brendan Bradley at St. Luke's Psychiatric Associates.  R. 40, 785-91, 798-803, 928-29, 938.

On March 1, 2022, Gregory Coleman, Psy.D., conducted a clinical interview and mental status examination of Plaintiff related to her Pennsylvania disability benefits claim.  R. 925-26. In his report, Dr. Coleman discussed Plaintiff's longitudinal history, including her hospitalization, before addressing her current functioning.  R. 928-29.  He reported at that time she was taking Geodon 40 mg three times a day, Propranolol 20 mg two times a day, Lithium 300 mg in the morning and 450 mg at bedtime, Clonazepam 2 mg one at bedtime and a half of tablet three times a day, Topamax 75 mg twice a day, Protonix 40 mg a day, Metformin 750 mg per day, and Melatonin 10 mg per day.  R. 929.  Plaintiff told Dr. Coleman her appetite was normal, but she had depressive symptoms such as dysphoric mood, irritability, and moodiness. Id.  She also tended to get quick moods, and concentration difficulties.  Id.  Regarding her anxiety, she had excessive apprehension and worry about fitness, ability to go back to work, and working around other people, and difficulties with concentration, restlessness, and irritability. Id.  She reported that therapy and medication have been "helpful" for her depression and anxiety. Id.  Dr. Coleman opined that Plaintiff did not meet the diagnostic criteria for bipolar disorder. Id.  At the examination, she was appropriately dressed and well groomed, her speech was fluent, she had full affect, and she reported her mood as neutral.  R. 930.  Her insight and judgment were good.  Id. at 931.  The diagnoses were ADHD based on reported history, unspecified bipolar and related disorder, and GAD.  Id.  Dr. Coleman found her prognosis was good, given continued compliance with mental health treatment and Plaintiff finding suitable employment after vocational training.  Id.

Dr. Coleman also completed a medical source statement (MSS) of ability to do work-related activities (mental).  R. 933-39.  He found Plaintiff's ability to understand, remember or

11

carry out instructions was not affected by any impairments.  R. 933.  Dr. Coleman reported her impairments affect her ability to interact with others and she had moderate limitations interacting appropriately with the public, supervisor, co-workers, and responding appropriately to usual work situations and changes in a routine work setting.  R. 934.  He opined that Plaintiff's impairments did not affect her ability to concentrate, persist, or maintain pace and to adapt or manage herself.  Id.

### B.  Non-medical evidence

Plaintiff lives at home with her husband, a full-time state trooper, and their twelve-year-old son, who is on the autism spectrum, has ADHD, and oppositional defiant disorder.  R. 37-38.  She helps her husband take care of her son, including managing her son's appointments, medications and talking to his teachers.  R. 38.  Plaintiff testified at the hearing on a typical day she will do laundry, straighten up around the house, and attend appointments, but sometimes when she is straightening up a room, she gets distracted, and it does not get done.  R. 41.  Her husband makes sure she correctly takes her medication by putting them in a pill organizer, so she does not forget to take them and does not take them twice.  R. 40.  She can dress, bathe and groom herself, do light cleaning, shop for household items monthly and take care of the cat.  R. 217.  Some of her medications make her tired so she generally takes a nap in the morning after her son goes to school.  R. 40-41.  In the Function Report, Plaintiff stated that she cooks and performs childcare every day, dresses, and showers/bathes three times a week, and does laundry once a week.  R. 217-18, 937.  She can walk and drive a car and goes out every couple of days.  R. 219.  In fact, Plaintiff drove herself twenty miles in the morning for the consultative examination.  R. 928, 938.  She was able to get herself ready for the 9:30 a.m. telephonic hearing

12

before the ALJ and told the ALJ she had an extra cup of coffee so she would not be tired because of her mediations.  R. 41.

Plaintiff reports socializing with her husband and son daily and has contact with her friends and father on the phone weekly.  R. 931.  She also speaks to her brother and sister weekly.  Id.  Her relationships with her family are good.  Id.  Plaintiff enjoys watching TV, calling friends, using Facebook, her phone or games on her tablet, and spending time with her cat.  R. 220, 931.  At the time of the hearing, Plaintiff was not employed.  R. 928.  The last time she worked was in November 2019 as a nurse and she said she was "good with her patients."  Id.  Her reasons for leaving her job were "due to trouble with the job tasks due to focus and attention and trouble with supervisors and coworkers."  Id.

She indicated that her symptoms have "improved, but [she] still experience[s] symptoms."  R. 939.  Additionally, Plaintiff testified at the hearing that the medications and counseling "help to a point."  R. 40.

## V.   <u>DISCUSSION</u>

### A.  <u>The ALJ properly evaluated and considered the opinion of treating psychiatrist Dr. Martinez-Jiminez.</u>

An "ALJ 'will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from [the claimant's] medical sources.'"  Thomas v. Kijakazi, No. 21-cv-3547, 2022 WL 17880922, at *6 (E.D. Pa. Dec. 22, 2022) (quoting Cheryl F. v. Kijakazi, No. 20-cv-16052, 2022 WL 17155681, at *10 (D.N.J. Nov. 22, 2022) (citing 20 C.F.R. § 404.1520c(a)).  Instead, the ALJ must evaluate the persuasiveness of the medical opinion based on five factors set forth in 20 C.F.R. § 404.1520c(c).  See Thomas, 2022 WL 17880922, at *6; see also Lawrence v. Comm'r of Soc.

Sec., No. 21-cv-01239, 2022 WL 17093943, at *4 (M.D. Pa. Nov. 21, 2022) (stating "[r]ather than assigning weight to medical opinions, [an ALJ] will articulate how persuasive he or she finds the medical opinions.") (alteration in original) (citations and internal quotations omitted). The factors include: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treating relationship and the frequency of exams; (4) the medical source's specialization; and (5) other factors including but not limited to the source's familiarity with the other evidence in a claim or an understanding of the disability program's policy and evidentiary requirements.  20 C.F.R. § 404.1520c(c).  The most important factors when determining the persuasiveness of a medical opinion are supportability and consistency.  Id. § 404.1520c(a); Rose v. Kijakazi, No. 20-3222, 2022 WL 910093, at *5 (E.D. Pa. March 29, 2022).

Supportability weighs "the extent to which the medical source's opinion is supported by relevant objective medical evidence and explanations presented by the medical source."  Cota v. Kijakazi, No. 21-cv-672, 2022 WL 3686593, at *5 (M.D. Pa. Aug. 25, 2022); 20 C.F.R. § 404.1520c(c)(1).  For the supportability factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1). Consistency means "the extent to which the medical source's opinion is consistent with the record as a whole."  Cota, 2022 WL 3686593, at *5; 20 C.F.R. § 404.1520c(c)(2).  Regarding consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim,

14

the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).  A key difference between the two factors is that "supportability considers the evidence and explanations 'presented b[y] a medical source' whereas consistency looks at 'evidence from other medical sources and nonmedical sources in the claim . . . .'" Gongon v. Kijakazi, 676 F.Supp. 3d 383, 397 (E.D. Pa. 2023) (citing 20 C.F.R. § 404.1520c(c)(1)-(2)).

The ALJ is only required to explain the supportability and consistency factors in the written opinion.  20 C.F.R. § 404.1520c(b)(2).  Even though the ALJ is not bound to accept any physicians' conclusions, the ALJ "'may not reject them unless [he] first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected.'"  Balthaser v. Kijakazi, No. 20-cv-06181, 2022 WL 2828848, at *6 (E.D. Pa. July 20, 2022) (quoting Cadillac v. Barnhart, 84 F. App'x 163, 168 (3d Cir. 2003) (additional quotations and citations omitted)); see also Densberger v. Saul, No. 20-cv-772, 2021 WL 1172982, at *8 (M.D. Pa. Mar. 29, 2021) (stating "provided that the decision is accompanied by an adequate, articulated reason, it is the province and duty of ALJ to choose which medical opinions and evidence deserve greater weight.").

An RFC assessment is the most a claimant can do in a work setting despite the limitations caused by his or her impairments.  20 C.F.R. § 404.1545(a)(1).  The RFC is based on all the relevant and other evidence in the case record.  Id. § 404.1545(a)(3).  It is the ALJ's exclusive responsibility to determine the claimant's RFC.  20 C.F.R. § 404.1546(c).  An ALJ must include in the RFC any credibly established limitations the record supports.  Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 147 (3d Cir. 2007).  The ALJ's RFC assessment must be "'accompanied

by a clear and satisfactory explication of the basis on which it rests.'" Fargnoli v. Massanari,

247 F.3d 34, 41 (3d Cir. 2001) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). The

ALJ, however, is not required to discuss or refer to every piece of the relevant evidence in the

record when assessing an RFC. Id. at 42. Once an ALJ has made an RFC determination it will

not be set aside provided substantial evidence supports the RFC. Burns v. Barnhart, 312 F.3d

113, 129 (3d Cir. 2002).

 When discussing Dr. Martinez-Jiminez's opinion, the ALJ stated:

> The claimant's psychiatrist [Dr.] Martinez-Jiminez, M.D.,
> provided a Medical Source Statement (MSS). She opined that the
> claimant had a "moderate" limitation in the following areas:
> understand, remember, and carry out simple instructions; and make
> judgments on simple work-related decisions. Dr. Martinez-
> Jiminez further opined that the claimant had a "marked" limitation
> in the following areas: understand, remember, and carry out
> complex instructions; make judgments on complex work-related
> decisions; interact appropriately with the public, co-workers, and
> supervisor(s); and respond appropriately to usual work situations
> and to changes in a routine work setting. The undersigned finds
> this opinion unpersuasive. While the undersigned concurs with the
> doctor's assessed moderate limitations, many of the marked
> limitations assessed are simply unsupported by and inconsistent
> with the record. Specifically, the record does reflect significant
> interpersonal conflict, especially lea[d]ing up to her January 2020
> hospitalization. However, after her psychiatric hospitalization, the
> record shows that the claimant's ability to engage in appropriate
> social interaction was improved. Thus, Dr. Martinez-Jiminez's
> marked limitation with respect to the claimant's ability to interact
> appropriately with co-workers and supervisors as well as the public
> is not supported by the record. Regarding the claimant's ability to
> respond appropriately to usual work situations and to changes in a
> routine work setting, the undersigned finds the doctor's marked
> limitation in this area unsupported by and inconsistent with the
> record. During her live testimony, the claimant endorsed the
> ability to perform a variety of activities, albeit with some
> assistance from family members without any exacerbation of her
> underlying impairments as she was able to maintain with routine

> treatment.  For these reasons, the undersigned finds Dr. Martinez-
> Jiminez's opinion unpersuasive.

R. 21 (internal citations omitted).

The ALJ also discussed the opinions of Anthony A. Galdieri, Ph.D., and Paul Thomas

Taren, Ph.D., who were state agency psychologists at the initial and reconsideration levels and

found them persuasive.  The ALJ noted that:

> . . . [Dr. Galdieri and Dr. Taren] opined that the claimant could
> understand, remember, and carry out one-to-two step instructions in
> a stable, low public setting on a consistent basis despite her
> impairments.  The undersigned finds these opinions persuasive as
> they are consistent with and supported by the record.  As noted
> previously, after the claimant's initial hospitalization and PHP, her
> care has been routine and conservative, with improvement noted.
> Her daily activities have also been consistent with the ability to
> perform work within the parameters opined by Drs. Galdieri and
> Taren.

R. 21 (internal citations omitted).

Additionally, the ALJ found Dr. Coleman's opinion to be partially persuasive.

Specifically, she stated that:

> While the undersigned finds Dr. Coleman's opinion with respect to
> social interaction as well [as] the claimant's ability to respond
> appropriately to usual work situations and to changes in routine
> work setting consistent with and supported by the record
> (particularly her improved status), other assessed limitations appear
> to be an underestimate of the claimant's capabilities.  For example,
> the doctor's opinion that the claimant with respect to her ability to
> make judgment on complex work-related decisions is inconsistent
> with the mental status findings of a variable degree of concentration
> during outpatient treatment, as previously discussed.  Rather, a
> moderate degree of impairment, which is consistent with the ability
> to perform unskilled work is appropriate.  For these reasons, the
> undersigned finds Dr. Coleman's opinion only partially persuasive.

R. 22.

Ultimately, the ALJ determined that Plaintiff has the RFC to perform a full range of work at all exertional levels, but with certain non-exertional limitations including unskilled work consisting of simple, routine tasks, with only simple decision-making, and only occasional changes in workplace. R. 17. Additionally, Plaintiff can tolerate occasional interaction with co-workers and/or supervisors, however, should have no direct public interaction. Id.

Plaintiff argues that Dr. Martinez-Jiminez's opinion is supported and consistent with the evidence in the record. Doc. 8, at 29. She suggests that the ALJ did not properly address the other medical opinions, and erroneously rejected Dr. Martinez-Jiminez's opinion as unpersuasive. Id. at 24-29.

Plaintiff implicitly argues in her brief that Dr. Martinez-Jiminez's opinion should be given more weight than the other opinions. Doc. 8, at 25-29. However, as Plaintiff acknowledges, the opinion of the treating medical provider is no longer entitled to controlling weight as it was prior to the change in the regulations. See 20 C.F.R. § 404.1520c(a); David K. v. Kijakazi, No. 20-cv-12419, 2022 WL 225451, at *6 (D.N.J. Jan. 26, 2022) (citations omitted); compare with 20 C.F.R. § 404.1527; see also Doc. 8, at 24. As a result, Dr. Martinez-Jiminez's opinion is not entitled to any more weight than any other medical providers' opinions despite the Plaintiff's urging otherwise. When considering the analysis of the medical providers' opinions, the ALJ's decision must be "read as a whole." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).

Plaintiff asserts that substantial evidence does not support the ALJ's decision to reject Dr. Martinez-Jiminez's finding that she had marked limitations interacting appropriately with co-workers and supervisors. Doc. 8, at 26. The ALJ directly addressed this, finding that "many of

the marked limitations assessed are simply unsupported by and inconsistent with the record." R. 21. While the ALJ acknowledged that the record reflects "significant interpersonal conflict," particularly leading up to her 2020 hospitalization, the decision provides further that after the psychiatric hospitalization, "the record show[ed] improvement in the claimant's ability to engage in appropriate social interaction." Id.

A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(F)(2)(d). Contrary to Plaintiff's contention, the ALJ's decision that Plaintiff did not have a marked limitation in interacting appropriately with co-workers and supervisors, particularly with medication modifications and therapy after her release from the hospital in 2020, is supported by substantial evidence. See Biestek, 139 S. Ct. at 1154. Plaintiff's mood was reported as stable, and she indicated medication and therapy were helping her. R. 793, 917, 929-31, 939. The ALJ instead found a moderate limitation[9] in Plaintiff's ability to interact appropriately with people, including co-workers and supervisors, consistent with the opinions of Dr. Galdieri, Dr. Taren, and Dr. Coleman and the record evidence regarding her general interactions with others. See R. 17, 21-24, 40, 931. The ALJ discussed the consistency and supportability of the medical providers' opinions in sufficient detail to review. See 20 C.F.R. § 404.1520c(b)(2); Densberger, 2021 WL 1172982, at *8. The record evidence suggested she had some, but not a serious inability to interact with co-workers and supervisors, with improvement with medication and consistent therapy. R. 40. The ALJ acknowledged and accounted for the

---

[9] A moderate limitation is when a claimant has fair functioning in an area "independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(F)(2)(c).

moderate limitation interacting with people by restricting her RFC to only occasional interaction with co-workers and/or supervisors.  R. 17; see Salles, 229 F. App'x at 147; Burns, 312 F.3d at 129.

Additionally, Plaintiff claims the ALJ's decision to reject Dr. Martinez-Jiminez's finding that she had a marked limitation in responding appropriately to usual work situations and changes in the work setting is not supported by substantial evidence.  Doc. 8, at 27.  The ALJ found this restriction unsupported and inconsistent with the record.  R. 21.  For example, during the hearing, Plaintiff testified about her "ability to perform a variety of activities" (albeit some with assistance from family members) without exacerbating her underlying impairments, which she was able to maintain with routine treatment.  R. 21, 38, 41.

Plaintiff noted improved symptoms after finding medication that works for her and could perform several daily activities.  R. 40, 217, 931, 939.  The ALJ thoroughly discussed the explanations of the medical providers and Plaintiff's limitations when reaching her decision.  R. 21-22.  The ALJ again decided Plaintiff had a moderate limitation in the ability to respond appropriately to unusual work situations and changes in the work setting and incorporated this limitation into the RFC appropriately restricting her to only occasional interaction with co-workers and/or supervisors and no direct public interaction.  R. 17, 21-22; see 20 C.F.R. § 404.1545(a)(1); see Salles, 229 F. App'x at 147; Burns, 312 F.3d at 129.

Contrary to Plaintiff's assertion, the ALJ did not rely on her own lay opinion when she decided Dr. Martinez-Jiminez's opinion was not persuasive.  Doc. 8, at 29.  As noted previously, the ALJ outlined and explained how the findings of the consultative examiner and two other state agency psychologists supported her decision.  R. 21-22.  The ALJ simply decided that Plaintiff

was not disabled and assigned her a restrictive RFC, which she is permitted to do. <u>Chandler v. Comm'r Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011); <u>see also</u> 20 C.F.R. § 404.1527(d)(1); 404.1546(c).

Finally, Plaintiff cites to <u>Cordero v. Kijakazi</u>, 597 F.Supp. 3d 776 (E.D. Pa. 2022) to challenge the ALJ's decision rejecting Dr. Martinez-Jiminez's marked limitations and specifically noted the ALJ did not cite to specific pages of the record. Doc. 8, at 26-29. <u>Cordero</u>, however, is distinguishable on several grounds. First and importantly, the regulations in effect when <u>Cordero</u> was decided provided that a treating physician's opinion must be given great, namely controlling, weight. 597 F.Supp. 3d at 791-92. The presumption in favor of Dr. Martinez-Jiminez's opinion does not apply to this case. <u>See</u> <u>Thomas</u>, 2022 WL 17880922, at *6; 20 C.F.R. § 404.1520c(a). Moreover, although <u>Cordero</u> provided that general record citations from the ALJ were "unhelpful" for that court's review, the issue in <u>Cordero</u> with the general citations was the substance of the citations themselves, not the lack of the page cites. <u>Cordero</u>, 597 F.Supp. 3d at 799-800. This was because the medical evidence actually supported the treating doctor's opinion—the opposite of what the ALJ ultimately found. <u>Id.</u> Here, the citations to the record support the ALJ's finding. Finally, in this case, Plaintiff only presented one medical provider who opined that Plaintiff had marked limitations while three others opined that she did not. R. 21-22. In <u>Cordero</u>, essentially all the doctors who examined the plaintiff found that plaintiff's medical impairments were severe and precluded work. <u>Cordero</u>, 597 F.Supp.3d at 814.

For all these reasons, the ALJ did not err when it evaluated Dr. Martinez-Jiminez's opinion.[10]  See Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 764 (3d Cir. 2009) (citation omitted) (providing "presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision").  Accordingly, Plaintiff's first claim fails.

### B.   The ALJ's Overall Evaluation of Plaintiff's Subjective Complaints Is Supported by Substantial Evidence.

When formulating Plaintiff's RFC, the ALJ discussed Plaintiff's subjective statements regarding her symptoms of pain.  R. 17-18.  Specifically, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limited effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> With respect to the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because the record simply does not support them.  The undersigned acknowledges that the claimant required psychiatric hospitalization with additional PHP care, her treatment since leaving the PHP two years ago has been routine and conservative. She has not required additional emergency department intervention for her mental impairments (save side effects from her medication), crisis intervention, or additional hospitalization. Further, routine, conservative treatment has demonstrated improvement in the claimant's symptomology.  Moreover, the

---

[10] Plaintiff also asserts that the ALJ's decision to discount Dr. Martinez-Jiminez's opinion affected the Step 5 analysis.  Doc. 8, at 29-30.  Because the ALJ found Dr. Martinez-Jiminez's opinion unpersuasive for the reasons discussed above, she was permitted to exclude those limitations from the RFC and the hypothetical questions to the VE.  Salles, 229 F. App'x at 148.

claimant's self-reported activities during the hearing and
throughout the record show the ability to engage in simple routine
activities with limited social interaction as set forth in the [RFC]
finding.  The undersigned acknowledges that the claimant has
residual depression, anxiety, and other limitations arising from her
impairments which prevent her from performing her past relevant
work.  However, the record in this matter supports the above-cited
limitations and the ability to engage in other work.  Additional
restrictions are unnecessary and unwarranted.

R. 20.

As part of the RFC analysis, the ALJ considers Plaintiff's subjective complaints.  See 20

C.F.R. § 404.1529(c).  A two-step process is used to evaluate a claimant's symptoms in disability

claims.  Social Security Ruling 16-3P: Titles II & XVI: Evaluation of Symptoms in Disability

Claims, SSR 16-3P, 2016 WL 1119029, at *3, *4 (S.S.A. Mar. 16, 2016).  First, it is determined

whether a claimant has "a medically determinable impairment that could reasonably be expected

to produce the individual's alleged symptoms."  Id. at *3.  Second, the ALJ evaluates the

intensity and persistence of an individual's symptoms such as pain and determines the extent to

which the symptoms limit the claimant's ability to perform work-related activities.  Id. at *4.

A claimant's own statements about pain or other symptoms are not sufficient, by

themselves, to establish that a claimant is disabled.  20 C.F.R. § 404.1529(a).  Part of the RFC

analysis includes whether complained of symptoms are "reasonably consistent with the objective

medical evidence and other evidence."  § 404.1529(c)(4).  Thus, an ALJ may discount subjective

complaints if they are inconsistent with the objective medical evidence.  Id.; see Weber v.

Massanari, 156 F. Supp. 2d 475, 485 (E.D. Pa. 2001) (explaining an ALJ "has the right, as the

fact finder, to reject partially, or even entirely" subjective complaints if they are not fully

credible) (citations omitted).

The ALJ is permitted to consider Plaintiff's daily activities when assessing the consistency of a claimant's symptoms.  See 20 C.F.R. § 404.1529(c)(3)(i).  An ALJ cannot make a single, conclusory statement that the claimant's statements about symptoms have been considered or are not consistent or supported in the record.  SSR 16-3P, 2016 WL 1119029, at *9.  Instead, "[t]he determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  Id.

An ALJ's conclusion is entitled to great deference regarding a claimant's subjective complaints as the ALJ is the one who has seen the hearing up close.  Biestek, 139 S. Ct. at 1157. The conclusion will be upheld so long as substantial evidence supports the conclusion.  See Horodenski v. Comm'r of Soc. Sec., 215 F. App'x, 183, 189 (3d Cir. 2007); see also Cosme v. Comm'r of Soc. Sec., 845 F. App'x 128, 133-34 (3d Cir. 2021) (holding substantial evidence, including opinions of medical doctors, supported ALJ's decision to discount claimant's subjective complaints).

Plaintiff disagrees with the ALJ's findings that her symptoms were inconsistent with the record based on her treatment and her self-report daily activities.  Doc. 8, at 19.  First, Plaintiff argues that the statement her treatment has been "routine and conservative" since January 2020 is not supported by substantial evidence.  Id.  "[R]eliance on 'conservative treatment' to discount . . . credibility takes on special significance in the mental health context."  Hull v. Berryhill, No. 18-cv-0006, 2018 WL 3546555, at *10 (M.D. Pa. July 24, 2018).  No bright line rule exists "for

what constitutes 'conservative' versus 'radical' treatment." <u>Robert M. Kijakazi</u>, 22-cv-1476,

2023 WL 5839299, at *9 (M.D. Pa. Aug., 7, 2023), <u>approved and adopted</u>, August 31, 2023.

I agree that Plaintiff's treatment after her hospitalization and inpatient treatment in

January 2020 could be classified as conservative and routine for the reasons the ALJ provides.

<u>See</u> <u>Brown v. Comm'r of Soc. Sec.</u>, No. 19-cv-2110, 2020 WL 1244186, at *6 (E.D. Pa. Mar.

16, 2020) (stating decision to classify claimant's treatment as conservative was not error when

ALJ found at time of evaluating medical evidence that claimant's symptoms were effectively

mitigated with conservative medication, claimant continued with range of daily activities, and

had goal of slowly reducing Klonopin dose); <u>Aurand v. Berryhill</u>, 17-cv-959, 2018 WL 2276250,

at *3, *11 (M.D. Pa. Apr. 23, 2018) (classifying claimant's treatment as conservative for mental

impairments when she had been taking prescription medication and attending counseling, even

after a10-day inpatient treatment several years prior when she had stopped taking medication and

relapsed on cocaine), <u>approved and adopted</u>, May 17, 2018; <u>McClease v. Astrue</u>, No. 11-cv-373,

2013 WL 5377778, at *12 (E.D. Pa. Sept. 26, 2013) (agreeing with ALJ's finding that plaintiff's

mental health treatment was routine and conservative when record contained no evidence of

plaintiff needing or receiving emergency treatment, inpatient psychiatric treatment, or intensive

outpatient treatment).  Plaintiff's treatment since 2020 has consisted of (except for a medication

adjustment related hospitalization in February 2021) regular appointments with her psychiatrist,

bi-weekly therapy, and medication.  R. 19, 40, 767, 773-74, 779, 785-91, 792-93, 798-803, 832,

928-29, 938.  Therefore, it could be classified as routine and conservative.

Other cases, however, support Plaintiff's assertion that her treatment has not been routine

and conservative, particularly because of the length of her treatment and type of medications she

has taken, which has included psychotropic medications such as Geodon, Abilify, and Seroquel.

See e.g., Nolasco v. Kijakazi, No. 21-cv-4119, 2023 WL 2773532, at *10-12 (E.D. Pa. April 3,

2023) (concluding ALJ's finding that claimant has underwent "conservative and routine" care as

sole reason to discount doctor's opinion was not supported by substantial evidence when

claimant had taken psychotropic medications and participated in psychotherapy to treat major

depressive disorder for five-year period, had two inpatient hospitalizations and three ER visits in

part because she was hearing voices directing her to kill herself, and had passive suicidal

thoughts and auditory hallucinations); Cordero, 597 F.Supp.3d at 799 (finding no support for

conclusion that treatment with medical provider was "routine and conservative" when medical

record set forth years of treatment without suggesting whether treatment was aggressive or

conservative); Thomas v. Colvin, No. 15-876, 2016 WL 4537065, at *3 (W.D. Pa. Aug. 30,

2016) (noting ALJ erred when he negatively assessed Plaintiff's mental health treatment as

"limited" and "conservative" when she took Depakote and Xanax for years, attended counseling

sessions with psychologist weekly, and saw psychiatrist every one to three months); Hull, 2018

WL 3546555, at *10 (stating lack of evidence of inpatient or ER visits does not render treatment

conservative when record shows years of medication use and consistent treatment from mental

health providers during relevant time); see also Lofton v. Kijakazi, No. 21-4284, 2023 WL

1993677, at *11 (E.D. Pa. Feb. 14, 2023) (noting ALJ's description of Plaintiff's mental health

as "minimal" was mischaracterization when plaintiff was first deemed disabled at age eight and,

after being evaluated for benefits as adult, was diagnosed with bipolar disorder, mood disorder,

schizoaffective disorder, personality disorder, ADHD, and borderline functioning and was

treated with various psychotropic medication combinations).

26

Even if the ALJ mischaracterized Plaintiff's treatment as routine and conservative when she considered the severity of Plaintiff's symptoms, any error was harmless.  See generally Hyer v. Colvin, 72 F. Supp. 3d 479, 494 n.16 (D. Del. 2014) (stating error is harmless error unless it affected party's "substantial rights," and changed outcome of decision, meaning it was material to disability determination) (citing Shinseki v. Sanders, 556 U.S. 396, 409 (2009).  This is because the ALJ's decision regarding Plaintiff's symptoms was supported by substantial evidence in the record.  See Milbourn v. Saul, No. 19-cv-5191, 2020 WL 4601222, at *6 (E.D. Pa. Aug. 11, 2020) (finding ALJ's characterization of general level of treatment as routine and conservative not reversible error when claimant responded well to medication, check-ups did not reveal downward trend in condition or management of symptoms, and group therapies were deemed no longer necessary); Albright v. Berryhill, No. 17-cv-529, 2018 WL 1123762, at *1 n.1 (E.D. Pa. Mar. 1, 2018) (overruling objection to magistrate judge's report and recommendation and providing that ALJ may discount subjective complaints when contrary evidence in the record exists supporting such a finding and if ALJ gives reasons for doing so) (citation omitted); Sturgill v. Colvin, No. 15-cv-1195, 2016 WL 4440345, at *10 (E.D. Pa. Aug. 23, 2016) (discounting Plaintiff's testimony regarding pain based on conservative treatment is allowed if it is not the only reason ALJ provides for discrediting testimony; it is permissible if ALJ also provides other medical evidence and discusses Plaintiff's own activities as reason for discounting claims of pain).

The ALJ highlighted additional objective evidence for discounting the severity of Plaintiff's symptoms.  Significantly, despite numerous adjustments and changes to her medications, Plaintiff has reported that her symptoms recently have been improving.  R. 20, 40,

793, 832, 929-30, 939.  The ALJ explained when addressing symptoms that the "record simply does not support" the intensity, persistence, and limiting effects of her symptoms.  R. 20.  Moreover, Plaintiff's daily activities support the finding regarding Plaintiff's symptoms.  See 20 C.F.R. § 404.1529(c)(3)(i).  Importantly, the ALJ did not wholly reject Plaintiff's allegations about the severity of her symptoms.  Rather, the ALJ incorporated many of these limitations, including her residual depression and anxiety which precluded her from performing past relevant work, and limited her to a restricted RFC consisting of simple, routine activities with limited social interaction.  R. 20.  The RFC also provided she was not to interact with the public.  Id.

Plaintiff's next contention is that the ALJ erred when it relied on Plaintiff's daily activities to reject her subjective symptoms.  Doc. 8, at 22.[11]  Plaintiff's daily activities and the medical evidence in the record support the determination that her symptoms were not as severe as alleged.  The ALJ noted that the self-reported activities during the hearing and throughout the record show Plaintiff had the ability to engage in simple routine activities with limited social interaction as set forth in the RFC and that additional limitations were not needed.  R. 20.  For example, Plaintiff is able to help take care of her son with her husband, does laundry, straightens the house, and attends appointments.  R. 38, 41.  She can dress, bathe, and groom herself, do light cleaning, shop for household items, and take care of the cat.  R. 19, 41, 217-18, 931, 937.  She drives and leaves the house every couple of days.  R. 219.  Plaintiff socializes with her

---

[11] Plaintiff also challenges the finding that Dr. Martinez-Jiminez's opinion was not persuasive on the grounds that the ALJ misstated the evidence regarding Plaintiff's "self-reported" daily activities.  Doc. 8, at 27.  Upon review of the record, I do not agree with this allegation and find the ALJ adequately explained why she decided his opinion was unpersuasive.  See supra Memorandum opinion, at 13-22.

husband, son, family, and friends.  R. 19, 931.  She also watches TV and uses Facebook and games on her tablet.  R. 220, 931.  Admittedly, Plaintiff reported feeling "some irritability" and "some mood swings" and "still hav[ing] problems with concentration and [her] memory."  R. 40. She said sometimes she forgets to do things, like empty the dishwasher and will get distracted straightening up a room.  R. 40-41.  Considering this, Plaintiff's daily activities support a finding that she is capable of a restricted RFC including simple, routine tasks with limits on her social interaction, consistent with the RFC, and that she is not disabled.  R. 16-17, 24; see Menkes v. Astrue, 262 F. App'x 410, 412 (3d Cir. 2008) (noting simple, routine tasks in disability proceedings "refer to non-exertional or mental aspects of work" and "performing a 'simple routine task' typically involves low stress and does not require maintaining concentration.").

Because substantial evidence supports the ALJ's conclusion regarding Plaintiff's subjective complaints and the Court should afford great deference to that finding, Plaintiff's challenges to the ALJ's analysis of her subjective symptoms fail.

**VI.**     <u>**CONCLUSION**</u>

The ALJ did not err when it considered and evaluated the opinion of Plaintiff's treating psychiatrist, Dr. Martinez-Jiminez.  Substantial evidence supports the ALJ's findings and the RFC.  Moreover, the ALJ properly considered Plaintiff's subjective complaints and the ALJ's decision is supported by substantial evidence.

Accordingly, Plaintiff's request for review (Doc. 1) is **DENIED**.  An appropriate order accompanies this opinion.


BY THE COURT:

<u>/s/ Craig M. Straw</u>
CRAIG M. STRAW
U.S. Magistrate Judge